UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| BERNARD J. PETTIS, | ) |
| | ) |
| Plaintiff, | ) |
| | )   1:06-cv-1365- SEB-TAB |
| vs. | ) |
| | ) |
| R.R. DONNELLEY AND SONS CO., | ) |
| | |
| Defendant. | |

**REPORT AND RECOMMENDATION ON
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

**I.   Introduction.**

Plaintiff Bernard J. Pettis claims that while working for Defendant R.R. Donnelley and Sons Co. ("RRD") he was subjected to a hostile work environment and retaliation.[1] [Docket No. 7.] The facts Plaintiff alleges, if true, are of the type that Title VII is intended to curtail. Plaintiff's allegations are based largely upon a rather damaging affidavit that Defendant attempts to exclude in connection with its pending motion for summary judgment. [Docket No. 39, 55.] For the reasons set forth below, the Magistrate Judge finds this affidavit would be admissible, and recommends that Defendant's motion for summary judgment be denied.

---

[1] Plaintiff's first amended complaint requests "just relief as a result of a racially hostile work environment, employment discrimination and discriminatory retaliation . . . ." [Docket No. 7 at 1.] While the complaint does not further explain the retaliation claim, doing so is unnecessary under the notice pleading standard. *See* Federal Rule of Civil Procedure 8(a); *Hefferman v. Bass*, 467 F.3d 596, 599 (7th Cir. 2006) ("The point of a notice pleading standard is that the plaintiff is not required to plead either facts or legal theories.").

**II.     Admissibility of the contested affidavit.**

Before recounting the facts most favorable to Plaintiff, the Court must address the admissibility of an affidavit of coworker David Powers submitted by Plaintiff. Defendant argues in its reply brief that Powers' affidavit "is legally attenuated, . . . and significant portions are conclusory, contain hearsay and are not based on personal knowledge, all of which undercut the affidavit's admissibility." [Docket No. 55 at 3.] Because Plaintiff did not request leave to file a surreply, he does not address this contention by Defendant. Nevertheless, Defendant's objections are overruled.

The allegations in Powers' affidavit primarily concern Tim Cain, a press operator/lead on whose line Plaintiff worked when he first began working for RRD. The first statement Powers makes that Defendant contests is: "In general conversation while working at RRD, I have heard Cain refer to blacks in a derogatory manner like 'nigger' on many occasions." [Docket No. 52, Ex. J at ¶ 7.] Defendant argues that there is no foundation to support Powers' claim that Cain used this offensive word because Powers does not state to whom he is referring, when, or where. [Docket No. 55 at 3.] The affidavit sufficiently addresses the context of this allegation. Earlier in the affidavit, Powers establishes that he worked with both Plaintiff and Cain at RRD during the spring and summer of 2005. Furthermore, while Powers does not provide an exact time and place in which he heard Cain use this epithet, he sufficiently establishes that the context in which he claims to have heard Cain use this language is at RRD during work. The testimony of Lindsay Carlile—an employee in the department where Cain and Plaintiff worked during the time period of the alleged harassment—further provides a basis that Cain used this term. [Docket No. 55, Ex. F at 26.]

Defendant also argues that Powers' assertion that it was common knowledge in the press room that Cain does not like minorities is unsubstantiated and lacks foundation. [Docket No. 55 at 4.] The fact that Powers worked in the press room for six years provides sufficient basis for establishing this type of knowledge. Furthermore, this notion is not wholly unsubstantiated, again because Carlile independently testified that Cain used the term "nigger" on several occasions. [Docket No. 55, Ex. F at 26.]

Defendant similarly argues that Powers' assertion that he observed Cain increasing the speed of the press when Plaintiff was working lacks foundation because he fails to specify the details surrounding this event. The fact that Powers worked in the press room for six years establishes that he has knowledge of how things are normally done and thus when a rate of speed would be higher than normal. The rest of the specific details sought by Defendants are certainly appropriate for cross-examination, but the lack of these details in the affidavit does not render the affidavit inadmissible.

Finally, Defendant argues that Powers' claim that he heard Cain say, "I got it running at 37 instead of 32—I'll make him quit," is inadmissible hearsay. However, this statement would not be hearsay because it is an admission "by a party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship." Fed. R. Evid. 801(d)(2)(D). Moreover, irrespective of the truth of this statement, the mere utterance of this statement is relevant to Cain's state of mind, and thus would be admissible for this reason as well.

Because none of Defendant's objections are sustainable, the affidavit would be admissible. Accordingly, portions of the affidavit are incorporated in the background set forth

below, which is written such that all facts and reasonable inferences are construed in favor of Plaintiff.  *See Mote v. AETNA Life Ins. Co.*, 502 F.3d 601, 606 (7th Cir. 2007).

**III.     Background.**

Plaintiff began as a temporary worker at the Crawfordsville plant of RRD at the end of March 2005.  He worked as a materials handler, reporting to Dan Hopkins, who assigned him to work with press operator/lead Tim Cain.  Cain recommended to Hopkins that Plaintiff should be hired as a regular full-time employee, which Hopkins did near the end of April 2005.  Plaintiff was one of two African-American employees in the department.

As a materials handler, Plaintiff would remove printed pages from the press, band them together in a "form," and stack the bundles on a skid.  Once the skid was full, he and another employee would place a top board on the skid, and Plaintiff would move the skid to another location.  Often Plaintiff would be joined by Cain in placing the top board on the skid, but the two would not communicate properly as they placed it.  Consequently, Plaintiff's hands would get smashed two to three times a day while trying to place the top board with Cain.  Rather than attempt to fix the communication difficulty, Cain would laugh at Plaintiff and ridicule him, often telling other employees, "I got his hands," or "ooh, ooh, ooh, ooh, ooh, look at him."  [Docket No. 40 at 4.]  As a result, Plaintiff's hands became swollen and tingled, and he lost feeling in them.  Furthermore, Plaintiff says that Cain would grab his crotch while looking at Plaintiff, would hit and kick Plaintiff's form, would snatch paperwork from Plaintiff's hand, and once ignored an injury Plaintiff sustained while on Cain's line.  Cain would also give other employees additional breaks that he did not offer to Plaintiff, and on one occasion he failed to inform Plaintiff that the line was breaking for lunch.

Coworker David Powers, who submitted the affidavit discussed at the outset of this opinion, maintains: "It is common knowledge in the press room that Cain does not like minorities, specifically blacks and Mexicans. In general conversation while working at RRD, I have heard Cain refer to blacks in a derogatory manner like 'nigger' on many occasions." [Docket No. 52, Ex. J, ¶ 7.] Likewise, another Caucasian press operator for RRD, Lindsay Carlile, heard Cain use the term "nigger" several times in private discussions. [Docket No. 52, Ex. F at 25-26.] And Powers attests that on more than one occasion, he "heard Cain refer to [Plaintiff] as a 'nigger,'" and say that he did not like Plaintiff, and that he "wanted to 'work him into the ground' and 'work him like a Mexican'" in order to get him to quit. [Docket No. 52, Ex. J, ¶ 8.] Powers also observed Cain making the press go faster so that Plaintiff would have to work harder, and then Cain would yell at him when the press would get jammed. Powers claims he never saw Cain speed up the press on new Caucasion workers, and Carlile claims Cain never made derogatory remarks toward him.

In his first one-on-one meeting with his supervisor, Dan Hopkins, Plaintiff told Hopkins about how Cain would smash his hands. He also told Hopkins that Cain stared at him like he hated him. In response, Hopkins removed Plaintiff from Cain's crew and placed him as a floater, where he would normally not be assigned to Cain's press.

Soon thereafter, Plaintiff was at an orientation for RRD after having been hired as a full-time employee. During this orientation, an employee from human resources spoke about behavior that would not be tolerated among employees and the chain of command to follow in the event of a problem. When the human resources leader opened the floor for questions, Plaintiff described how he had been mistreated for two months by a lead. The human resources

5

leader commended him for going to his supervisor first and said that if the situation was not properly remedied, he should then raise the issue with human resources.  Plaintiff then said he "felt like [his] supervisor did what he thought was best," but he wanted to know why the lead was still in that position.  [Docket No. 52, Ex. A at 136.]  The human resources person then asked him who his supervisor was, what department he worked in, and leaned over and whispered something to the gentleman who had started the orientation that day.  The human resources person then said that he had followed the proper chain of command.  Plaintiff left that meeting with the belief that human resources had heard his complaint.

      Hopkins' reassignment of Plaintiff to floater generally relieved him from working with Cain but only as long as Hopkins was on site.  When Hopkins was gone, Cain was commonly the acting supervisor.  On one such occasion, Cain placed Plaintiff on Dale Swick's line, who failed to properly train Plaintiff the first night despite Plaintiff's requests.  The next night Swick became angry with Plaintiff, pointed at him, and speaking to another employee said, "That black motherfucker over there couldn't even do a fucking folio, and he couldn't even fucking stack." [*Id*. at 162-63.]  Swick then began to mock how Plaintiff would do the folio, and they all laughed at him, including Cain who had been watching in the background.

      The next night on Swick's line, when it seemed that the press was about to start running, Cain walked quickly over to Plaintiff and stopped behind him and looked at Swick, who had turned toward Plaintiff and stared at him as if he was going to "jump and fight" him.  [*Id*. at 166.]  Cain stared back for a couple minutes until another employee, Brad Stephens, stood on Plaintiff's left side and was pretending that Swick had Plaintiff in a headlock and was swinging,

and jumping up and down.² Swick continued to stare at Plaintiff, and Cain responded by looking at Plaintiff "with this smirky grin on his face." [*Id*. at 167.] Later that night, Cain had Plaintiff stay several minutes after his shift ended. As a result, when Plaintiff got to the parking lot no one was there. Fearing for his safety after the earlier incident, he walked outside the parking lot along the street to get to his car rather than walking across the parking lot.

 Upon Hopkins's return to work, Plaintiff told Hopkins that he wanted to be transferred. When asked for a reason, Plaintiff reported these incidents to Hopkins. Plaintiff also told Hopkins that he was afraid to come to work and that when he would get there, he would sit in his car and wait for people he knew to arrive to walk in with them. In response to Plaintiff's report, Hopkins called Swick into his office and asked him whether he "had said derogatory things to Bernard." Swick said that "he may have cursed on the press, but absolutely nothing was directed towards Bernard." [Docket No. 41, Ex. E at 35.] Hopkins also instructed Plaintiff to discuss the matter directly with Swick, which he did not do. However, Plaintiff had no further problems working with Swick.

 Later that same week, while Plaintiff was preparing for work by asking the lead questions, Cain stood nearby openly staring at Plaintiff's leg, which had a cut and was not bandaged at the time. Cain pointed at Plaintiff's leg and said something to his assistant. Cain continued to stare until Plaintiff eventually looked back at him, at which point Cain said "You black bastard," and then walked away. [Docket No. 52, Ex. A at 183.] Plaintiff was going to go to the supervisor's office right then to report the incident, but the line started, so he waited until

---

² What exactly occurred here is not clear. Plaintiff testifies that Brad "stopped on my left-hand side and then positioned hisself [sic] as if [Swick] had me in a headlock and started swinging, jumping up and down, going, "Ooh, ah, ooh, ah." [Docket No. 52, Ex. A at 167.]

later.  When he later looked for Hopkins, he determined Hopkins was gone for the evening.  He went to see Hopkins the next Monday about the incident, but Hopkins was on vacation for that week, and Cain was the acting supervisor.

On June 7, 2005, while Hopkins was on vacation, Plaintiff worked on a line where he was required to stack forms above shoulder height, which employees had unofficially been told was improper because it could result in injury.  The press operator, not the materials handler, decides when to stop stacking on top of a form.  [*Id*. at 78.]  While working on one form, Plaintiff saw Cain pull aside Jon Ellis, the press operator on the line Plaintiff was working.  They were looking at Plaintiff and talking, and Plaintiff had the sense that they were planning to do something to him.  They let the top of his form go well over the four foot height.  At this time, Plaintiff felt his neck pop, after which severe pain eased into his left shoulder.  Plaintiff was diagnosed as having a pinched nerve, the prognosis of which is dim.  Plaintiff now receives Social Security disability and long-term disability from RRD for his workplace-related injury.  Due to RRD's policy that a leave due to disability cannot exceed an employee's length of service with the company or one year, whichever is less, Plaintiff was terminated on July 18, 2005, because he had been absent longer than he had worked there.

**III.    Discussion.**

While Plaintiff's complaint alleges both racial harassment and retaliation, Defendant's motion for summary judgment addresses only the racial harassment claim.  The burden is on Defendant to demonstrate that there is no genuine issue of material fact in dispute and that the evidence demonstrates as a matter of law that Plaintiff is unable to demonstrate the requirements of his racial harassment claim.  *See Mote v. AETNA Life Ins. Co.*, 502 F.3d 601, 606 (7th Cir.

8

2007) (quoting *Tegtmeier v. Midwest Operating Eng'rs Pension Trust Fund*, 390 F.3d 1040, 1045 (7th Cir. 2004) and Federal Rule of Civil Procedure 56(c)).  The requirements that Plaintiff must ultimately demonstrate are:  "(1) he was subject to unwelcome harassment; (2) the harassment was based on his race; (3) the harassment was severe or pervasive so as to alter the conditions of the employee's work environment by creating a hostile or abusive situation; and (4) there is a basis for employer liability."  *Williams v. Waste Management of Illinois*, 361 F.3d 1021, 1029 (7th Cir. 2004).  Furthermore, the alleged harassment must be "both subjectively and objectively so severe or pervasive as to alter the conditions of [his] employment and create an abusive working environment."  *Whittaker v. N. Illinois Univ.*, 424 F.3d 640, 645 (7th Cir. 2005) (quoting *Wyninger v. New Venture Gear, Inc.*, 361 F.3d 965, 975 (7th Cir. 2004)); *see also AMTRAK v. Morgan*, 536 U.S. 101, 116 n.10 (2002).

>    A.    **Subject to unwelcome harassment.**

Plaintiff alleges he was harassed both verbally and non-verbally in his workplace.  Cain routinely smashed Plaintiff's hands with the top board and then ridiculed him.  Plaintiff also contends that Cain also called him a "black bastard."  Swick, who made fun of Plaintiff's work, referred to him as a "black motherfucker," and mocked him while others, including Cain, laughed at him.  Additionally, non-verbal behavior by Cain such as looking at Plaintiff while grabbing his own crotch, hitting and kicking Plaintiff's form, snatching paperwork from Plaintiff, and openly staring at Plaintiff in a menacing way could obviously be perceived as harassment.  Likewise, failing to ensure that Plaintiff was given proper breaks, while permitting other employees additional breaks, while less direct, could likewise bolster a claim of harassment.  Finally, according to Plaintiff's account, Swick stared at him in such a way that he

9

believed Swick wanted to fight him, while another employee made gestures indicating an intent by Swick to hurt Plaintiff, without any reproach from Cain, who was the acting supervisor at the time. Nothing in the record indicates that Plaintiff desired or instigated this behavior or that he thought it was funny or well-intentioned. A reasonable juror could perceive this behavior to be harassment, and the evidence suggests that Plaintiff indeed perceived it this way.

    B.   Harassment was based on race.

Recently the Seventh Circuit affirmed the dismissal on summary judgment of a hostile work environment claim that was based on gender and disability in which the plaintiff, like the Plaintiff in this case, sustained a back injury while on the job. *See Hancock v. Potter*, No. 07-1589, 2008 U.S. App. LEXIS 13306 (June 24, 2008). The Seventh Circuit acknowledged that the "plaintiff's working environment was not the most supportive," explaining that in response to the plaintiff's complaint that her supervisor yelled at her she was viewed by management as not a "team player." *Id*. at *15-16. Nonetheless, the Seventh Circuit affirmed the dismissal of the plaintiff's hostile work environment claim because she was unable "at every step of the way . . . to shore up any bit of evidence that indicated that she was discriminated against on the basis of her gender or disability." *Id*. at *16. *Hancock* is notably unlike the case at bar. In addition to having more evidence of harassment in the workplace, Plaintiff has strong evidence that the harassment was motivated by race discrimination.

The most blatant evidence is the use of the terms "black motherfucker" and "black bastard," which strongly supports the conclusion that any harassing behavior experienced in connection with those terms was based on Plaintiff's race. The rest of the alleged harassment is not so overtly based on raced. However, harassing conduct need not be explicitly racial in order

10

to create a hostile environment, though it "must have . . . a racial character or *purpose* to support a Title VII claim." *Hardin v. S.C. Johnson & Son, Inc.*, 167 F.3d 340, 345 (7th Cir. 1999). For example, Cain's intentionally speeding up the press on which Plaintiff was working and then yelling at Plaintiff when the press would jam but not doing likewise to new Caucasian employees underscores the inference that Cain directed this behavior toward Plaintiff because of Plaintiff's race.

Other indications that Cain's negative treatment of Plaintiff was motivated by race are that on multiple occasions Cain used the term "nigger" both generally and in reference to Plaintiff, that it is common knowledge at the workplace that Cain does not like minorities, and that Cain wanted to work Plaintiff "like a Mexican" in order to get him to quit. While such "[m]ean-spirited or derogatory behavior of which a plaintiff is unaware, and thus never experiences, is not 'harassment' of the plaintiff," *Mason v. S. Ill. Univ. at Carbondale*, 233 F.3d 1036, 1046 (7th Cir. 2000), this behavior may be relevant in demonstrating that Cain's racially neutral negative treatment of Plaintiff is based on Plaintiff's race. *See e.g., id*. at 1047. Given the record before the Court, whether the harassment of Plaintiff was based on race is a material issue of fact not appropriate for summary judgment.

  **C.**  **Harassment was severe or pervasive.**

The conduct of which the plaintiff complains need only be pervasive *or* severe to give rise to a hostile work environment. *Cerros v. Steel Techs., Inc.*, 398 F.3d 944, 950 (7th Cir. 2005). In making this determination, courts are to consider the totality of the circumstances—including the conduct of co-workers and supervisors. *Mason*, 233 F.3d at 1044-45. Likewise, "[c]ourts should not carve up the incidents of harassment and then separately

analyze each incident, by itself, to see if each rises to the level of being severe or pervasive." *Id.* at 1045.

A good deal of the alleged harassment—for example, the staring, grabbing of the crotch, hitting and kicking of the form, ignoring of the injury—could arguably be characterized as not particularly severe. Plaintiff's testimony indicates that some of these activities may have happened more than one time, but "[m]any employees have to put up with some amount of rude, arrogant, or boorish behavior at work . . . ." *Patton v. Indianapolis Pub. Sch. Bd.*, 276 F.3d 334, 339 (7th Cir. 2002). So, these incidents, if considered in a vacuum, would likely be insufficient as a matter of law to establish that the harassment of Plaintiff was severe or pervasive so as to alter his work environment by creating a hostile or abusive situation.

But the factual record here, when considered in a light most favorable to Plaintiff, is far from a vacuum. The above events must be considered in combination with incidents in which Plaintiff was made to feel intimidated or belittled while being referred to as "black motherfucker" or "black bastard." These incidents render the situation much more troubling. *See Cerros v. Steel Techs., Inc.*, 398 F.3d 944, 950 (7th Cir. 2005) ("[A]n unambiguously racial epithet falls on the 'more severe' end of the spectrum."). Likewise, Plaintiff unnecessarily sustained workplace injury when his hands were routinely smashed, which after a relatively short period of time would certainly seem like an abusive situation. The facts most favorable to Plaintiff paint a picture in which a reasonable person in Plaintiff's situation would most likely feel unwelcome and might very well fear for his safety in or around the workplace. Also, Plaintiff's testimony that he expressed fear to Hopkins and would avoid walking from his car to the workplace building alone indicates that he did actually subjectively fear for his safety.

Furthermore, all of these events occurred within a concentrated two or three month time period, suggesting that this behavior was pervasive. Considering the totality of the situation, the alleged harassment of Plaintiff was arguably both severe and pervasive.

### D. Basis for employer liability.

An employer may face liability for harassment delivered by co-workers or supervisors of the plaintiff, though the appropriate standard differs depending upon the relationship of the harasser. If the harasser is merely a coworker, the employer is liable "only where the plaintiff proves that the employer has 'been negligent either in discovering or remedying the harassment.'" *Hrobowski*, 358 F.3d at 477-78 (quoting *Parkins v. Civil Constructors*, 163 F.3d 1027, 1032 (7th Cir. 1998)). If the harasser is a supervisor, the employer is strictly liable "subject to the possibility of an affirmative defense where the plaintiff suffered no tangible employment action." *Hrobowski v. Worthington Steel Co.*, 358 F.3d 473, 477 (7th Cir. 2004). The affirmative defense consists of two elements: "(a) that the employer exercised reasonable care to prevent and correct promptly any . . . harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Burlington Indus. v. Ellerth*, 524 U.S. 742, 765 (1998); *Cerros*, 398 F.3d at 952.

Whether Cain—the primary person Plaintiff points to as creating the harassing environment—is properly classified as a supervisor or as a co-worker is an issue in this case. Cain was at times more of a leader/co-worker to Plaintiff and at other times was more akin to a supervisor. When Hopkins was away, Cain was the acting supervisor and had authority to direct employees' work, change work schedules, and recommend reprimands. [Docket No. 52, Ex. B

at 27.]  At all other times the relationship between Plaintiff and Cain is not exactly clear, but taking all reasonable inferences in Plaintiff's favor, Cain maintained sufficient control over Plaintiff to support the conclusion at the summary judgment stage that Cain was acting in a supervisory capacity.  Perhaps the most significant evidence on this point comes from Powers, who stated in his affidavit:

> Cain acted as the assistant supervisor.  When Hopkins was not there Cain, because of his long seniority, served as the Acting Supervisor in Hopkins['] absence.  Even when Hopkins was there Cain called the shots and ran the press room.  Cain would tell Hopkins to just stay in his office and he would handle everything.

[Docket No. 52, Ex. J at ¶ 6.]  Even Defendant acknowledges that at times Cain filled in as the acting supervisor.  [Docket No. 40 at 13.]  Thus, Defendant analyzes whether there is a basis for employer liability by utilizing the *Ellerth/Faragher* analysis.  [*Id.*]; *see also Ellerth*, 524 U.S. at 765; *Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998).

Accordingly, Defendant has the burden to establish as a matter of law that it exercised reasonable care to prevent and correct promptly any harassing behavior and that Plaintiff unreasonably failed to take advantage of any preventive or corrective opportunities Defendant provided him or to avoid harm otherwise.  The record indicates that Defendant had an anti-harassment policy in place in which Plaintiff could direct any issues to a supervisor, human resources, or an ethics hotline.  The record further indicates that Plaintiff understood this policy.

Defendant argues that because it had this policy in place and Plaintiff understood it, Defendant necessarily exercised reasonable care to prevent and correct promptly any harassing behavior based on race because Plaintiff never raised race as an issue with his supervisor or human resources.  The record, however, does not support this argument.  As Defendant

acknowledged in its brief, Plaintiff complained to Hopkins about the slur made by Slick. [Docket No. 55 at 10.] Furthermore, while the issue of race was not discussed in the first dialogue between Plaintiff and Hopkins, nonetheless Hopkins "acted *as if* Plaintiff made a race-based complaint." [Docket No. 55 at 8.] This, together with Powers' allegation that it was common knowledge that Cain did not like minorities and the fact that Pettis was only one of two African-Americans in the department, supports a reasonable inference that Hopkins was on notice that the alleged harassment was potentially race-based. Therefore, just having the policy in place is insufficient at the summary judgment stage to demonstrate that Defendant promptly and adequately addressed the issues raised by Plaintiff.

The evidence further indicates that Defendant is unable to establish as a matter of law that it addressed Plaintiff's concerns adequately so as to prevent further harassment. While Hopkins addressed many of Plaintiff's concerns, his resolutions were arguably insufficient to correct and prevent the harassing behavior Plaintiff alleges: Cain was never reprimanded; other employees involved in the alleged harassing behavior were not addressed at all; Cain remained in leadership and even supervisory positions; and Plaintiff was told to resolve these issues with his coworkers.         For example, after the alleged incident with Swick, Hopkins spoke with Swick and was apparently satisfied with the discussion because Hopkins told Plaintiff to speak with Swick to resolve the matter. Given that Plaintiff had no further incidents with Swick, this action by Hopkins appears to have sufficiently resolved the situation as it pertained to Swick. However, employees other than Swick were also purportedly involved in this incident, and other than pulling aside and briefly asking press operator Ellis about the situation, there is no evidence that Hopkins did anything to address the matter more universally in order to fully remedy the

situation and prevent such future events from occurring.  This non-action by Hopkins suggests that a jury could find Defendant negligent in remedying the harassing situation.  Indeed, two other alleged events occurred after the event with Swick: Cain called Plaintiff a "black bastard," and Cain and Ellis allowed Plaintiff's form to get so high that Plaintiff was seriously injured.

Furthermore, the evidence indicates that Plaintiff took advantage of the preventive and corrective opportunities offered by Defendant.  According to instructions Plaintiff received at orientation, employees were to complain to their supervisors first, and then if the situation was not adequately resolved, they were to speak to human resources.  Plaintiff first spoke with his supervisor.  He then spoke with human resources.  And then again, he spoke with his supervisor.  And, as discussed above, Plaintiff made Hopkins aware in one of the discussions that race was involved.

Drawing all facts and inferences in favor Plaintiff, Defendant has failed to show as a matter of law that it exercised reasonable care to prevent and correct promptly the harassing behavior reported by Plaintiff, and that Plaintiff unreasonably failed to take advantage of any preventive or corrective opportunities provided by Defendant.  Therefore, given Plaintiff's version of the facts, a jury could find in Plaintiff's favor.  Accordingly, summary judgment is not appropriate.

### V.     Conclusion.

For the foregoing reasons, the Magistrate Judge recommends that the Court deny Defendant's motion for summary judgment [Docket No. 39].  Any objections to the Magistrate Judge's Report and Recommendation shall be filed with the Clerk in accordance with 28 U.S.C. § 636(b)(1), and failure to file timely objections within the ten days after service shall constitute

a waiver of subsequent review absent a showing of good cause for such failure.

Dated:  07/11/2008

_____
Tim A. Baker
United States Magistrate Judge
Southern District of Indiana

Copies to:

Sara Jeanine Kagay
VEDDER PRICE KAUFMAN & KAMMHOLZ PC
skagay@vedderprice.com

Denise K. LaRue
HASKIN LAUTER  & LARUE
dlarue@hlllaw.com

Richard H. Schnadig
VEDDER PRICE, P.C.
rschnadig@vedderprice.com

Ryan Patrick Sink
HASKIN LAUTER & LARUE
rsink@hlllaw.com

Heather L. Wilson
LOCKE REYNOLDS LLP
hwilson@locke.com